**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**SHARON E. O'HARA**
      **Plaintiff,**

**vs.**                                   **Case No. 3:07cv351/RV/MD**

**UNIVERSITY OF WEST FLORIDA,**
      **Defendant.**

_____

## REPORT AND RECOMMENDATION

   This case filed pursuant to 42 U.S.C. § 2000e, Title VII of the Civil Rights Act ("Title VII") is before the court upon defendant's motion for summary judgment and statement of facts (doc. 74 & 75).  The court entered a detailed order directing the plaintiff to respond (doc. 76) and she has done so.  (Doc. 78).  Upon review of the evidence in the summary judgment record, it is the opinion of the undersigned that defendant's motion for summary judgment should be granted in part and denied in part.


## PROCEDURAL  HISTORY and FACTS

   Plaintiff Sharon O'Hara began employment with the University of West Florida on or about January 31, 2003 as a contract employee of the Florida Small Business Development Center ("SBDC") Network.  (Doc. 74, exh. 1 at ¶ 7).[1]  She held the position of  Coordinator for the Defense Economic Training Assistance ("DETA")

---

[1]Ms. O'Hara asserts that Ms. Faria's sworn statement should be disregarded in its entirety because she was not employed by UWF at the relevant time, and much of her statement is hearsay. Ms. Faria was the respondent in the EEOC charging document (doc. 46 at 3).

**Program.** (*Id.*) **This position was a grant-funded contract position for a discrete and finite term, with no guarantees of future employment and which was subject to termination at any time.** (*Id.*) **Ms. O'Hara's contract term expired on September 29, 2005. (Doc. 74, exh. 2 at exh. D). On Monday, April 18, 2005, Jerry Cartwright wrote what can be characterized as a letter of reprimand to Ms. O'Hara regarding her unprofessional behavior at a departmental meeting held on the previous Friday. (Doc. 74, exh. 2, exh. B). Ms. O'Hara wrote a lengthy rebuttal letter in her defense the same day. (Doc. 74, exh. 2, exh. C). The following week,[2] Mr. Cartwright gave Ms. O'Hara written notice that her employment with the University would end effective September 29, 2005, and that effective immediately she should return keys and her office cell phone and begin working from home. (Doc. 74, exh. 2, exh. D). She filed a complaint of discrimination with the EEOC and filed this case upon receipt of her right to sue letter.**

**In her fifth amended complaint, Ms. O'Hara asserts that UWF discriminated against her in violation of Title VII by subjecting her to sexual harassment and retaliation. The alleged discrimination took the form of terminating Ms. O'Hara's employment, retaliating against her and treating her unequally. (Doc. 46 at 3).[3] Ms. O'Hara contends that UWF failed to take action when formal complaints were made[4] concerning the sexual harassment and inappropriate comments of Jerry Cartwright and Larry Strain, and that UWF allowed the behavior to continue, thus tacitly endorsing a hostile work environment. (Doc. 46 at 7). Ms. O'Hara asserts that Jerry Cartwright made advances and inappropriate comments to her, several times telling her words to the effect of "you know what you have to do for me to have your**

---

[2]The date of this action is in dispute, but is not a material fact in this case.

[3]She clarifies in her response that her failure to acquiesce to and her complaints about Jerry Cartwright's "quid pro quo" demands was a basis for her retaliatory termination. (Doc. 78 at 20).

[4]Ms. O'Hara does not specify that she was the one making complaints. She testified at her deposition that she was not the only one who complained to HR. (Doc. 74, exh. 3, at 53 lines 1-2).

program succeed," and that he retaliated against her by sending her home to "work from home" in April of 2005 for the remaining five months of her contract and did not renew that contract. (*Id.*) Larry Strain is also alleged to have made sexually harassing comments both in private and in front of other employees. Ms. O'Hara lists several examples of the alleged harassment in her complaint. She also asserts that she took all of the prescribed steps to report the behavior of Strain and Cartwright to her supervisor and to the UWF Human Resources Department but was denied assistance in preventing further sexual harassment and retaliatory remarks. (*Id.* at 8). Furthermore, she asserts that Jerry Cartwright did not renew her contract because she refused to give in to his sexual harassment and because she reported his and Larry Strain's behavior to the Human Resources Department. (*Id.*)

Defendant has moved for summary judgment and filed a statement of facts and various summary judgment materials including excerpts from Ms. O'Hara's deposition and two supporting affidavits. (Doc. 74-75). According to the defendant, these documents establish that there are no genuine issues of material fact to be tried and further establish that Ms. O'Hara cannot prove she was subjected to sexual harassment or retaliation. Defendant first contends that Ms. O'Hara cannot establish a *prima facie* case of sexual harassment. Without affirming or denying that veracity of Ms. O'Hara's allegations of sexual harassment, defendant maintains that she has not established that the alleged harassment was sufficiently severe or pervasive enough to alter the terms and conditions of her employment. Even if she had met the elements of a *prima facie* case, defendant contends that the adverse employment decision stemmed from a legitimate, non-discriminatory reason: Ms. O'Hara's poor interpersonal skills and the effect her behavior was having on the SBDC, both locally and regionally. With respect to Ms. O'Hara's retaliation claim, defendant contends that she cannot establish a *prima facie* case because she did not engage in protected activity, and that if she did, there was no causation between the allegedly protected activity and the adverse employment action.

The court directed Ms. O'Hara to respond to the defendant's submissions. (Doc. 76). The court's order advised Ms. O'Hara of the importance and ramifications of Rule 56 summary judgment consideration, and directed her to file and serve affidavits and any other documents or materials authorized to be filed under Federal Rule of Civil Procedure 56 and Northern District of Florida Local Rule 56.1(A). (Doc. 76). Ms. O'Hara was also specifically instructed to file and serve a separate, short and concise statement of the material facts as to which she contended that there existed a genuine issue to be tried, and warned that all material facts set forth in the statement of facts filed by the defendant would be deemed to be admitted unless controverted by her statement of material facts. (*Id.* at 3). Ms. O'Hara filed an opposition to a motion for summary judgment which, although not in the traditional form of an affidavit, was sworn under penalty of perjury. (Doc. 78). Despite the court's specific instruction, Ms. O'Hara did not submit a separate statement of facts. In lieu of this, she addressed the contents of the defense exhibits which provided the basis for its statement of facts, sequentially addressing statements made Mr. Cartwright's affidavit. (Doc. 78 at 9-16).

In her response, Ms. O'Hara contends that the defendant's reliance upon excerpts of her deposition is improper because such excerpts can be "taken out of context." She asserts that the defendant should be required to tender a complete, unabridged, and certified copy. Ms. O'Hara has cited no authority for her assertion. Although Fed.R.Civ.P. 56(c) formerly provided that summary judgment was appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), effective December 1, 2007, the language of this rule was changed to omit specific reference to depositions, instead referring only generally to "the discovery and disclosure materials on file." Thus, Ms. O'Hara's conclusion that a party must file entire depositions rather than excerpts of depositions is no

longer supported even by a literal reading of the language of the rule. And, other courts that have considered the issue have found that the submission of deposition transcript excerpts, rather than entire depositions, in support of a motion for summary judgment is proper, because a party who believes that there is additional relevant information in the deposition transcripts that is not contained in the excerpts is free to file its own excerpts or the full transcripts in support of its response. See, e.g., *Zhanjian Go-Harvest Aquatic Products Co., Ltd. v. Southeast Fish & Seafood Co.*, 2008 WL 516109 (S.D.Fla. 2008); *Sandova v. Wackenhut Correctional Corp.,* 21 F.3d 1109, 1994 WL 171703 (5th Cir. 1994); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) (finding that deposition excerpts are often preferred by the district court if they are properly authenticated); *Dean v. Chrysler Corp.,* 38 F.3d 568, 1994 WL 574188 (5th Cir. 1994). Ms. O'Hara has not submitted either the complete deposition or any additional excerpts.[5]

Moving to the question of the proper authentication of the deposition excerpts, Ms. O'Hara is correct that they are not authenticated. To authenticate a deposition excerpt, a party should include the cover sheet and the court reporter's certificate, neither of which was done in this case. *See Alexander v. CareSource*, 576 F.3d at 560 (citing cases). However, although Ms. O'Hara complains about the fact of the lack of authentication, she raises no challenge to the substantive accuracy of the excerpts provided, other than to claim that they can be taken "out of context." Thus, under the circumstances, it is not improper for the court to consider them. *Id.*; cf. *Griffiths v. Certain Underwriters at Lloyds, London*, 2010 WL 1463405 (D.N.H. 2010) (suppressing depositions due to alleged errors in transcription).

Defendant also submitted the sworn statements of Cynthia Faria and Jerry Cartwright in support of its statement of facts. Because Ms. O'Hara chose to

---

[5]Ms. O'Hara asserts in her reply that she has not had money to obtain a copy of her deposition because she has been unable to secure gainful employment since her contract with UWF ended. (Doc. 78 at 1-2)..

address the contents of these statements rather than the actual statement of facts, the court will address each statement in turn.

Cynthia Faria worked for UWF as the Employee Relations Manager from April of 2006 through January of 2009 and currently holds the position of Assistant Director of EEO, Affirmative Action, and Workers Compensation. (Doc. 74, exh. 1). Ms. Faria's duties include investigation of employee complaints of discrimination and preparation of the University's Position Statements in response to discrimination charges filed either with the Florida Commission on Human Relations ("FCHR") or the Equal Employment Opportunity Commission ("EEOC"). (*Id.*) Although Ms. Faria was not employed at UWF during Ms. O'Hara's tenure, she handled the entirety of the investigation and prepared the University's Position Statement after investigation. (*Id.* at ¶ 4). She was also the respondent in the EEOC charging document. (Doc. 46 at 3). Ms. Faria describes Ms. O'Hara's employment with the University as a "grant funded contract position for a discrete and finite term with no guarantees of future employment" which was subject to termination at any time. (Doc. 74, exh. 1 at ¶ 7). Ms. O'Hara's chain of command included her immediate supervisor Kate Hoelshcer and upper-level supervisor Jerry Cartwright. (*Id.* at ¶ 8). Ms. Faria states that she reviewed the Human Resources ("HR") files for the time period Ms. O'Hara was employed by the University and found no records of Ms. O'Hara having filed any formal grievances, having discussed any unlawful employment practices with anyone in the Human Resources Department, or having written to the HR department about unlawful employment practices. (*Id.* at ¶¶10-12). Ms. Faria explains that the only record of Ms. O'Hara making a complaint of any kind to HR was her report of a confrontation with Larry Strain, Director of the UWF Small Business Development Center ("SBDC"). No unlawful activities were referenced and Ms. O'Hara did not make a formal complaint about the incident. (*Id.* at ¶¶ 13-16).[6]

---

[6]Ms. Faria's characterization of the record as a report of a "confrontation" seems to go beyond the face of the June 6, 2003 "notes," the author of whom is not identified. The "notes" indicate that the unidentified author "Met with Sharon O'Hara from SBDC." The remainder of the document reads as follows:

Ms. Faria's investigation revealed that Mr. Cartwright notified Ms. O'Hara by letter dated April 29, 2005 that O'Hara's contract would not be renewed, although she was authorized to continue her work from home through the end of her contract period, September 29, 2005, which was in keeping with University policy. (*Id.* at ¶¶ 17-19),

Several unidentified coworkers of Ms. O'Hara informed Ms. Faria during her investigation about alleged work performance and/or behavioral problems that Ms. O'Hara displayed. (*Id.* at ¶¶20-23). Ms. Faria was told that Ms. Hoelscher and/or Mr. Cartwright met with Ms. O'Hara following displays of inappropriate behavior in an attempt to counsel her or encourage her to take advantage of the University's Employee Assistance Program ("EAP"). (*Id.* at ¶ 24). Ms. Faria asserts that her investigation revealed no evidence that Ms. O'Hara had been subjected to sexual harassment or retaliation during her tenure with UWF. (*Id.* at ¶¶ 25-26).

Ms. O'Hara contends that Ms. Faria's statement should be disregarded entirely because Ms. Faria was not a UWF employee during the period of Ms. O'Hara's employment, and her statements constitute hearsay. (Doc. 78 at 9). This ignores the fact that Ms. Faria was the person in charge of the investigation of Ms. O'Hara's allegations, and that her affidavit merely reports what she found or what she was told, without swearing to the truth or accuracy of what she found or was told. Ms. O'Hara also asserts in her reply that the fact that Ms. Faria found no evidence that

---

Concerns:
          Larry Strain and Sharon do not get along. Larry believes the Defense Economic Transition Assistance Program (DETA) which Sharon coordinates is a duplicate of some of his programs. Jerry Cartwright FSBC been mediating between the two for a while. However, Jerry seems to be put out and told Sharon he would get rid of DETA and Sharon. Various other issues between the three also complicate matters.

Recommended – Alternative Dispute Resolution
          Can file Step 1 Grievance if necessary.

Sharon is frightened about making any move. She fears she will lose her job.

(Doc. 74, exh. 1, exh. A)

*Case No: 3:07cv351/RS/MD*

she had complained is not proof that she made no complaints, stating under penalty of perjury that she "complained 'several times.'" (Doc. 78 at 10). However, Ms. O'Hara testified at her deposition that she could not provide dates for any of her visits to UWF's HR department or the names of anyone she spoke to, and that she did not keep copies of the grievances she filed. (Doc. 74, exh. 3 at 47 lines 16-21; at 48 lines 6-8, 22-24; at 51, lines 1-3; at 52 lines 14-16; at 53 lines 4-16; at 54 lines 11-18; at 72 lines 11-13, 22-23; at 73 lines 18-25; at 74 lines 9-15; at 75 lines 14-20, at 85 lines 1-3, 20-25; at 86 line 1-5; at 88 lines 10-14; at 220 lines 7-8). She explained that she had not been in such a situation before and did not anticipate ending up in litigation or needing copies. (Doc. 74, exh. 3 at 52 lines 2-4, at 73 lines 4-5; at 86 lines 5-7; at 88 lines 13-14). Ms. O'Hara's description of the complaints she filed and meetings she had with HR personnel is clearly at odds with Ms. Faria's assertion that UWF has no record of Ms. O'Hara having filed any formal grievances or complained about any allegedly unlawful employment practices. (Doc. 74, exh. 1 at ¶ 10-14).

The second statement defendant submitted is that of Jerry Cartwright, State Director of the Florida Small Business Development Center ("SBDC"), one of the individuals Ms. O'Hara accuses of the harassment. (Doc. 74, exh. 2). Ms. O'Hara has sequentially addressed each statement set forth in Cartwright's affidavit in her response, although not every statement is part of the statement of allegedly undisputed facts.

Ms. O'Hara offers no objection to the statements set forth in paragraphs one through four setting forth background information. In paragraphs 5 and 6 of his affidavit, Cartwright asserts that Ms. O'Hara began to display work performance and behavioral problems soon after being hired. She was allegedly hostile to coworkers, insubordinate to superiors, unable to communicate professionally or effectively, and unable to accept advice or feedback, often becoming negative, loud, and argumentative. Ms. O'Hara denies that her work performance was ever a problem

or that she ever became negative, loud or argumentative. (Doc. 78 at 11). She appends to her response a copy of her employment evaluation from the time period of September 29, 2003 through October 31, 2004 that was signed by Mr. Cartwright and that reflected an overall rating of "superior performance." (Doc. 78, exh. C).[7] Despite the high rating, the evaluation included two notations which alluded to interpersonal difficulties on the job. First, with respect to evaluating the employee's strong points and accomplishments during the rating period, the evaluation noted:

> There was also improvement in interpersonal relationships with center directors and SDO staff; however, more collaboration and smoother relationships are still needed.

Areas in which the employee could make improvement included this comment:

> Continued improvement in interpersonal communication skills and consensus building is needed both within routine intra-office relationships and with the Network DETA Specialists and Regional SBDC Directors. Learning to temper opinions when working with others is needed.

(Doc. 78, exh. C).

Cartwright next stated that the SBDC atmosphere which had been congenial prior to Ms. O'Hara's arrival became increasingly strained during Ms. O'Hara's tenure. (Doc. 74, exh. 2 at ¶ 7). Ms. O'Hara responds by asserting that DETA's mere existence made Mr. Strain hostile to her because he believed that the SBDC office was already serving the market that DETA was supposed to serve, such that DETA was superfluous. (Doc. 78 at 12). Ms. O'Hara counters Cartwright's assertion about her causing dissension with other SBDC personnel in the region by reiterating that it was the existence of the DETA program that caused the dissent. (Doc. 74, exh. 2 at ¶ 8, doc. 78 at 12-13). To illustrate some of the problems with Ms. O'Hara's

---

[7]Employees were ranked on a scale of one to five in eleven areas. An employee who received from 45-55 points received an overall rating of "superior performance." Ms. O'Hara had a total of 45 points. No subsequent performance evaluations are in the record.

performance, Mr. Cartwright offered an email he had received from the SBDC Director at Gulf Coast Community College complaining of Ms. O'Hara's lack of professionalism, disregard for her peers, and contempt for and defiance of the FSBDC Network programs and its personnel. (Doc. 74, exh. 2 ¶¶ 8 & 9, exh. A). Ms. O'Hara denied the allegations contained in the email, claiming that the email was merely the writer's attempt to cause problems for the DETA program with the hopes of eliminating it. (Doc. 78 at 13). She also notes that this March 19, 2004 email was not specifically mentioned in her November 2004 performance evaluation.

Mr. Cartwright averred that he and Ms. Hoelscher attempted to counsel Ms. O'Hara regarding her inappropriate behavior on "many occasions" and suggested that she take advantage of the free confidential counseling through UWF's EAP. He states that when he believed counseling to be required he sought advice from and maintained direct contact with the UWF Human Resources director regarding the situation. He identified his final attempt at counseling as his letter of April 18, 2005. (Doc. 74, exh. 2 at ¶¶ 10-13 & exh B). Mr. Cartwright states in the letter that it was a follow-up to an April 15, 2005 meeting in which he was asked to intervene. The letter stated in relevant part:

> Through the courts of that meeting your behavior and comments directed towards other professional members of the State Director's Office staff and that which was directed to me was not only very unprofessional but was clearly insubordinate in nature. I specifically indicated that your behavior was unacceptable and for you to be reserve in your demeanor. There were no clear or justifiable reasons for your attitude, behavior exhibited or comments made to the individuals present.
>
> This is not the first time that such behavior has been exhibited during your tenure with the State Director's Office. I will again recommended that you seek professional guidance at the University through the employee assistance program.
>
> This continued behavior can not be condoned as it has a direct and negative affect (sic) on the overall morale in this Department as well as the management of the DETA grant program that I am ultimately

**responsible for. Personnel interactions at every level of the FSBDC Network and internally at the States Director's Office demand the highest level of professionalism and respect regardless of position. The behavior exhibited totally disregarded that covenant and jeopardizes the successful operation of the DETA program.**

(Doc. 74, exh. 2, exh. B).

Despite the letter's reference to "again" recommending that Ms. O'Hara seek professional guidance, Ms. O'Hara denies that either Mr. Cartwright or Ms. Hoelscher ever attempted to counsel her, and asserts that Cartwright was not even present at the meeting about which the final "alleged counseling" took place. (Doc. 78 at 13-14). Cartwright characterizes Ms. O'Hara's written response to his letter, also dated April 18, 2005, as being "argumentative and insubordinate" in nature. (Doc. 74, exh. 2 at ¶¶14 & 15). Ms. O'Hara began her response by stating that she realizes she is "taking some liberties here," but that she wanted to explain "the circumstances surrounding the failures that existed in the meeting on all of our parts." (Doc. 74, exh. 2, exh. C). She described problems that she and her assistant had obtaining DETA marketing materials, including problems with co-workers who either refused to help or jumped in mid-stream to make changes to a brochure plaintiff was developing. Ms. O'Hara explains that she became frustrated early in the meeting and vented in the form of tears when one of her co-workers lied about telling her she could change the tag line of the brochure. She accused Mr. Cartwright of exacerbating the situation by taking sides after he came into the meeting, and insulting her by telling her that she was not listening when in fact it was he and two others who were not listening to her. She enumerated 11 reasons for the "failed communication," and although she does not identify the actors in each instance, she does not clearly accept responsibility for any of the listed failures.[8]   Ms. O'Hara

---

[8]One of the listed reasons is "Inappropriate comments about someone's past behavior or problems in front of co-workers." (Doc. 74, exh. 2 at C, p.2). Although Ms. O'Hara does not specifically so state, it appears from the context of the letter that she is the "someone" whose past behavior was referenced at the meeting.

stated that if she is "guilty of disrespect, unprofessional behavior and improper comments, [Mr. Cartwright] is guilty as well and even more so." She accused him of making the meeting about her personally instead of looking at the facts, making the frustrating situation even more intense by his reaction, and inappropriately bringing up past events, although immediately following that assertion she asserted that it was Mr. Cartwright's past failure to introduce the DETA program in a decisive and well thought out fashion that was the cause of the problems. She referenced having had to work very hard to forgive Cartwright and Larry Strain for what they put her through when she first arrived and states that she did so because of her belief in the DETA program.  She stated:

> I find it difficult to work with my co-workers so, I am going to see HR tomorrow morning to seek a way to reach a resolution concerning the problems you and I, and now me and others, seem to have concerning communicating together and having sensitivity to each others (sic) needs.
>
> . . .
>
> Mr. Cartwright, I am not your enemy and you would be hard pressed to find someone who cares as much as I don about what we do here as an organization.  I realize that by going to Human Resources, my job will be at risk.  (You could decide to fire me, or just not rehire me for the DETA Program Coordinator or just not put in a proposal for the new funds.)  I just want someone to sit us down for a face-to-face discussion about where the meeting failed.  I want you to take some responsibility for your actions, just like you are asking me to do.  I will not accept your letter of reprimand going into my personnel file. I have almost 10 years with this organization and I gave up a lot to come here to lead this program because I believe in the cause.  I still believe in the cause and want to be a part of the team, if you will only let me.

(*Id.*)  On two separate pages, she presented the chronology of events leading up to the meeting in question where she ripped another employee's suggested mock-up brochure in half and Mr. Cartwright was summoned.

In her response to the defendant's motion for summary judgment, Ms. O'Hara defends her letter by saying that it was "professional, respectful, and accurate as to

the situation" and that, although the letter was addressed and directed to Mr. Cartwright and did not indicate that anyone else had received a copy, the letter was an "attempt to once again seek help from HR." (Doc. 78 at 14). Ms. O'Hara further asserts that Mr. Cartwright's letter was the first letter to go into her personnel file, and that she did not consider it "counseling," but rather an attempt by Cartwright to force her to acquiesce to his sexual demands. (*Id.*)

Mr. Cartwright avers that Ms. O'Hara raised no complaints of sexual harassment in her April 18, 2005 letter, and denies that she raised this issue at any other time during her employment. (Doc. 74, exh 2 at ¶ 16). Ms. O'Hara admits that she did not raise the issue of sexual harassment in her letter to Mr. Cartwright but unequivocally states that she raised the issue with HR on several occasions and sought the advice of the university ombudsman. (Doc. 78 at 15). Furthermore, Ms. O'Hara was questioned about this at her deposition and essentially responded that she did not include this issue in the letter because she had already complained until she was "blue in the face about sexual harassment" but things continued to go down hill. (Doc. 74, exh. 3, at 271 lines 1-9). And, even from the incomplete deposition excerpts, it is clear that Ms. O'Hara has sworn that she believed herself to have been the victim of sexual harassment and/or unwanted sexual advances and that she had made complaints about the actions of Cartwright and Strain to the men directly and/or to HR although she did not immediately file a formal complaint. (See doc. 74, exh. 3, at 47 lines 1-25; at 48 lines 1-12; at 51 lines 1-3; at 52 lines 9-13, 17-25; at 53 lines 1-16; at 54 lines 11-18; at 72 lines 11-25; at 73 lines 8-21; at 74 lines 4-18; at 75 lines 14-25; at 85 lines 1-25; at 86 lines 1-3, 23-25; at 88 lines 19-25; at 175 lines 3-25; at 22 lines 7-8; at 271 lines 1-18).

Cartwright also indicates that Ms. O'Hara did not raise the issue of retaliation with him. (Doc. 74, exh. 2 at ¶ 17). Ms. O'Hara counters that the retaliatory act, sending her to work from home under such restrictions that she was basically "doing nothing," occurred after her letter was received by HR, (doc. 78 at 15), with

the implication being that she did not have an opportunity to raise the issue with Mr. Cartwright once the retaliatory act had been completed.

The final paragraphs of Cartwright's affidavit detail the process through which he decided not to renew Ms. O'Hara's contract and how he notified her of such by letter dated April 29, 2005. (Doc. 74, exh. 2 at ¶¶ 18-21). The court notes that although the letter was dated April 29, 2005, and he purports to have delivered it to Ms. O'Hara on that date. However, the letter was signed by Ms. O'Hara on April 27, 2005 and the body of the letter indicated that she should return keys and other items to the Office Manager by close of business on April 27, 2005. (Doc. 74, exh. 2, exh. D). Ms. O'Hara asserts that Cartwright had been made aware of her complaints as per HR policy and that it was her unwillingness to submit to his advances that played a part in his decision-making process. (Doc. 78 at 16).

Finally, Cartwright avers that in deciding not to renew Ms. O'Hara's contract he was not motivated by any unlawful animus. Rather, he made the decision after discussing the situation with Ms. O'Hara's immediate supervisor, Ms. Hoelscher, and after considering Ms. O'Hara's behavior in the office, complaints he had received, and her refusal to accept counseling or attempt to modify her actions. (Doc. 74, exh. 2 at ¶ 22). Ms. O'Hara denies this, merely claiming that it was not any inappropriate behavior on her part that bothered Cartwright, but rather her many complaints to HR. (Doc. 78 at 16). She also urges the court to take note of the fact that Cartwright did not deny or address her allegations of sexual harassment, instead focusing his affidavit on the reasons for sending her to work at home and terminating her contract. She claims that the mere fact that Cartwright did not deny the charges casts sufficient doubt on the proffered non-discriminatory reasons to permit a reasonable fact finder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.

Ms. O'Hara alludes in her response to information that her assistant Carol Gentry allegedly provided to the defense about Ms. O'Hara crying almost daily in her office near the end of her tenure, and suggests that this is probative of the

harassment she endured. (Doc. 78 at 18). She states that she knows this information was provided because it came up during her deposition, but she did not provide either the deposition excerpts or any sort of statement from Ms. Gentry to support this.

## LEGAL ANALYSIS

### Summary Judgment Standard

In order to prevail on its motion for summary judgment, UWF must show that Ms. O'Hara has no evidence to support her case or present affirmative evidence that Ms. O'Hara will be unable to prove her case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If UWF successfully negates an essential element of Ms. O'Hara's case, the burden shifts to Ms. O'Hara to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510. Plaintiff O'Hara must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp.*, 477 U. S. at 324 (quoting Fed.R.Civ.P. 56(e)). Ms. O'Hara must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Celotex Corp., supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997)("Rule 56(e) . . . requires the nonmoving party to go beyond the pleading and

by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c), (e))); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Ms. O'Hara in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to her. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, Ms. O'Hara still bears the burden of coming forward with sufficient evidence of every element that she must prove. *Celotex Corp.*, 477 U.S. 317 (1986). A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552.

<u>Legal standard for sexual harassment claims under Title VII</u>

Title VII makes it unlawful for a covered entity to discriminate against any individual with respect to the compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a))1)

Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal 'civility code.' " *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (en banc). "Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." *Id.* To establish a *prima facie* case of a hostile work environment based on sexual harassment or a *quid pro quo* sexual harassment claim, a plaintiff must show: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual

favors, and other conduct of a sexual nature; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that there is a basis for holding the employer liable. *Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 808 (11th Cir. 2010); *Brown v. Snow,* 440 F.3d 1259, 1265 (11th Cir. 2006) *Pipkins v. City of Temple Terrace, Fla*. 267 F.3d 1197, 1199-1200 (11th 2001) (citing *Johnson v. Booker T. Washington Broad. Serv., Inc*., 234 F.3d 501, 508 (11th Cir.2000) (applying test from *Mendoza v. Borden, Inc*., 195 F.3d 1238, 1245 (11th Cir.1999) (en banc))); see also *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004). When a plaintiff is required to show that she suffered an adverse employment action, she must show that she suffered a tangible employment action, which is a significant change in employment status such as firing or reassignment with significantly different job responsibilities. *Brown*, 440 F.3d at 1265.

Ms. O'Hara may satisfy her initial burden through either direct or circumstantial evidence. Direct evidence is "evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (quoting *Burrell v. Bd. of Trs. of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997). "[O]nly the most blatant remarks... constitute direct evidence of discrimination." *Id.* (Citing *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quoting *Schoenfeld v. Babbitt*, 168 F.3d 1257 (11th Cir. 1999)); see, e.g., *Wright* 187 F.3d 1287, 1305-1306 (11th Cir. 1999) (HR director's comment to employee you will regret [making a complaint with the EEOC]" was direct evidence of retaliation); *Burrell,* 125 F.3d at 1393-1394 (evidence that the decisionmaker told the plaintiff that "he wanted to hire a man for the position because too many women filled First Federal's officer positions" was not direct evidence that she was terminated later because of her sex); *Caban-Wheeler v. Elsea*, 71 F.3d 837, 842-43 (11th Cir. 1996) (a statement by the decisionmaker that he wanted a black person to have a white employee's job was direct evidence that the white

employee was terminated for racially discriminatory reasons); *Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 930 (11ᵗʰ Cir. 1995) (decision maker's statement that women were simply not tough enough to do the job from which the plaintiff had been removed was direct evidence of discrimination). If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence. *Wilson,* 376 F.3d at 1086 (citing *Burrell,* 125 F.3d at 1393). Furthermore, "[s]tatements made by a non-decision maker are not probative of discriminatory intent as direct evidence." *Hyde v. K.B. Home, Inc.,* 355 Fed. Appx. 266, 272 (11ᵗʰ Cir. 2009) (citing *Standard v. A.B.E.L. Servs. Inc.,* 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998)). Defendant concedes that at her deposition, Ms. O'Hara testified about an incident that, if true, would constitute direct evidence of a claim of *quid pro quo* sexual harassment. (Doc. 74, exh. 3 at 175 lines 5-9)(Ms. O'Hara testified that Mr. Cartwright stated that if he could have his way with her then she could have whatever she needed for her program). Defendant asserts that Ms. O'Hara did not raise a claim of *quid pro quo* harassment in her FCHR/EEOC charge, and therefore the incident about which she testified during her deposition is outside the scope of her administrative charge, not properly at issue in this case, and by implication, not properly considered direct evidence of discrimination. (Doc. 74 at 7, n.1, citing *Bridges v. Standard Pacific of Tampa GP, Inc.,* 2007 WL 177688 at *2 (M.D. Fla. 2007) (plaintiff is limited to matters that sufficiently relate to or grow out of the allegations of the administrative charge). Neither Ms. O'Hara's FCHR nor her EEOC charge is before the court. However, she states in her response, under penalty of perjury, that she did assert in her EEOC charge that Mr. Cartwright often made such comments, and a similar assertion is contained within the complaint.

Even if the court were to reject the seeming *quid pro quo* statement(s) as direct evidence of discrimination, a victim of sexual harassment need not provide evidence of a direct and express sexual demand to make a successful claim. *Frederick v. Sprint/United Management Co.,* 246 F.3d 1305, 1312 (11ᵗʰ Cir. 2001). In the absence of direct evidence of discrimination, the plaintiff may present

circumstantial evidence and invoke the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. If a plaintiff establishes this *prima facie* case, a presumption of discrimination is created, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-507, 113 S.Ct. 2742, 2747 (1993). "'[T]he defendant must clearly set forth, through the introduction of admissible evidence,'" reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Id.*, 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55, and n. 8, 101 S.Ct. 1089, 1094-95, and n. 8, 67 L.Ed.2d 207 (1981)).[9]

If the defendant satisfies this burden, the presumption disappears and plaintiff must prove that the proffered reasons were not the true reasons for the employment decision. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08, 113 S.Ct. 2742, 2747-48, 125 L.Ed.2d 407 (1993); *see also Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Ms. O'Hara can avoid summary judgment if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer, and (2) creates a reasonable inference that sex was a determinative factor in the actions of which she complains. *See Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 370 (5th Cir. 1997).

Despite the burden-shifting framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S., at 253, 101 S.Ct., at 1093;

---

[9]The burden on defendant to proffer a non-discriminatory reason for its action is a burden of production only, and is satisfied regardless of the persuasive effect of the proffered reason; the burden of persuasion always remains with the plaintiff. *St. Mary's Honor Center v. Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747.

*St. Mary's Honor Center v. Hicks,* **509 U.S. at 507, 113 S.Ct. at 2747. Plaintiff must establish a** *prima facie* **case and rebut any legitimate non-discriminatory explanation proffered by the employer.** *St. Mary's,* **509 U.S., at 507, 113 S.Ct., at 2747.**

## Ms. O'Hara's *prima facie* case

Taking the facts in the light most favorable to Ms. O'Hara, it cannot be disputed that she easily presents four of the five prongs of the prima facie case. As a female, Ms. O'Hara clearly belongs to a protected group. She has alleged that Cartwright and Strain subjected her to unwelcome sexual harassment, whether sexual advances, requests for sexual favors or other conduct of a sexual nature, an assertion that the defendant has not denied. The nature of the harassment she describes was clearly based on her sex. Finally, although there appears to be no physical evidence of it, whether in the possession of Ms. O'Hara or UWF, Ms. O'Hara asserted in her complaint, her deposition, and her response to the motion for summary judgment that she had reported the harassment to her employer, although, with the exception of having received an apology from Mr. Strain for a single incident in which he was involved, nothing was accomplished. (Doc. 78 at 19)[10]. It is the fourth element of the test, that requires that the harassment be sufficiently severe or pervasive to alter the terms and conditions of her employment and create a discriminatorily abusive working environment, which warrants more detailed discussion.

The Supreme Court has stated that Title VII is not meant to be a general code of civility in the workplace. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998). When considering a hostile environment claim, a court must filter out complaints regarding "'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and

---

[10]The court notes that the sketchiness and anonymity of the June 6, 2003 notes referenced in Ms. Faria's affidavit and set forth above does not lend itself to great confidence in the University HR's record keeping.

occasional teasing.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284 (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)); see also *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998) (neither judges nor juries should mistake "ordinary socializing in the workplace-such as male-on-male horseplay or intersexual flirtation-for discriminatory conditions of employment.") Title VII "requires neither asexuality nor androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Oncale*, 523 U.S. at 81, 118 S.Ct. at 1003.

Determination of whether a plaintiff has established the fourth component of the test (that the harassment is sufficiently severe or pervasive to alter the terms and conditions of employment) entails both a subjective and objective analysis. *Reeves,* 594 F.3d at 808-809; *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). The employee must *subjectively* perceive the harassment as severe or pervasive enough to alter terms or conditions of employment, and this subjective perception must be *objectively* reasonable. *Reeves*, 594 F.3d at 809 (citing *Mendoza*, 195 F.3d at 1246) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993))). "So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious." *Reeves,* 594 F.3d at 809 (quoting *Harris* 510 U.S. at 22, 114 S.Ct. 367). The objective component involves a fact intensive inquiry, that requires viewing the harassment "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 118 S.Ct. 998 (1998). This is because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." The Supreme Court has said that the following four factors should be considered in determining whether harassment objectively altered an employee's terms or

conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Clark County School Dist. v. Breeden,* 532 U.S. 268, 270-271; 121 S.Ct. 1508, 1510 (2001); *Reeves,* 594 F.3d at 808; *Mendoza*, 195 F.3d at 1246. And, either severity <u>or</u> pervasiveness is sufficient to establish a violation of Title VII. *Reeves*, 594 F.3d at 808.

Defendant has neither discussed the specifics of nor attempted to deny Ms. O'Hara's allegations. Instead, it merely recites the four factors above and asserts that she has not demonstrated harassment sufficiently severe or pervasive to alter the terms of her employment. (Doc. 74 at 7).

Ms. O'Hara has failed to describe many of the specific details of the alleged harassment she endured while working at UWF from January of 2003 through April of 2005.[11] Such details, while perhaps embarrassing or uncomfortable for her to relate, are at issue here and are key to the court's determination of whether Ms. O'Hara has succeeded in alleging a prima facie case. Cf. *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 77, 118 S.Ct. 998, 1000 (1998) (precise details of alleged conduct were irrelevant to legal point at issue, and thus were described only generally "in the interest of both brevity and dignity.") The court's order directing Ms. O'Hara to respond to the defendant's motion specifically advised that she could not "successfully defeat a motion for summary judgment with mere formal denials or general allegations that do not disclose the facts in detail and with precision." (Doc. 76 at 1-2). Her reluctance to describe the incidents weakens her claim, as does her failure to have obtained witness statements or even identify the

---

[11]Although Ms. O'Hara's contract did not expire until September of 2005, because she worked from home from April through September of 2005, she presumably was not subject to any additional harassment during this time frame.

individuals she would seek to call as witnesses and proffer their testimony.[12] Still, the record reflects that Ms. O'Hara has made the following sworn assertions with respect to her allegations of sexual harassment:

- Mr. Cartwright asked Ms. O'Hara what size bra she wore and touched her back and neck inappropriately while they were at McGuire's restaurant. The record does not unequivocally indicate that this was a work related function, although Ms. O'Hara reports that another employee was present and witnessed the incident. (Doc. 46 at 7).

- Mr. Cartwright asked Ms. O'Hara out for drinks on several occasions. She declined except on one occasion when other employees were present. (Doc. 46 at 7).

- Mr. Cartwright "cornered" Ms. O'Hara in her office after hours to make "sexual statements and requests," and on one occasion asked her to accompany him to a "gentleman's club." (Doc. 46 at 7).

- Mr. Strain humiliated and sexually harassed Ms. O'Hara in front of other employees by making "inappropriate gestures pointing while bending over and told me I was to perform certain acts in certain areas he pointed to." (Doc. 46 at 7).[13]

- Ms. O'Hara refers to having been subjected to sexual advances and comments to the effect of "We can make you a star if you would just do this." (Doc. 74, exh. 3 at 52).

---

[12]For instance, she states "witnesses called into court and placed under oath will provide such testimony as to strongly validate the plaintiff's charges" and "evidence and testimony will be fluid in coming and more than sufficient to support the plaintiff's charges if testimony were obtained in a proper setting (where the witnesses were assured that their testimony would not result in more retaliatory actions), under oath and with the appropriate questions being posed to each witness." (Doc. 78 at 4-5, 18). Ms. O'Hara asserts that evidence to prove her case exists, but she cannot produce it because of economic circumstances. (*Id.* at 18-19). The record contains no indication that Ms. O'Hara's economic constraints would be any different were this case to proceed to trial.

[13]The court surmises that this is the incident for which Mr. Strain was made to apologize. (Doc. 78 at 7, 19; doc. 74, exh. 3 at 88). There are no other allegations of inappropriate behavior on the part of Mr. Strain.

–   Ms. O'Hara states that at a conference Cartwright asked her if she was going to get a hotel room because he wanted to come up and stay. (Doc. 74, exh. 3 at 85, 86 & 88).

–   Cartwright told Ms. O'Hara words to the effect of if she exposed herself to him, he would do whatever and if he could have his way with her, she could do whatever she needed for the DETA program.  (Doc. 74, exh. 3 at 175).

–   Cartwright made comments about Ms. O'Hara's bra size and said he would like to put his hands all over her.  (Doc. 74, exh. 3 at 175).

–   Ms. O'Hara asked Cartwright not to touch her again and not to make comments again and told him she felt like she was being sexually harassed, but Cartwright's response was to laugh at her.  (Doc. 74, exh. 3 at 271).

–   Ms. O'Hara maintains that she was subjected to jokes and comments of a sexual nature; was forced to endure a sexually hostile workplace; and "inappropriate touching of a sexual nature took place on several occasions." (Doc. 78 at 3).

–   Ms. O'Hara asserts that she was regularly "threatened" by Mr. Cartwright when he was sexually harassing her. (Doc. 78 at 14).

–   Ms. O'Hara alludes to Mr. Cartwright's unspecified "sexual demands" (doc. 78 at 14, 16).

–   Ms. O'Hara cried in her office almost daily near the end of her tenure with UWF, evidencing the seriousness, frequency, severity, humiliating, and offensive nature of the situation.  (Doc. 78 at 18).

–   Mr. Cartwright would "often" stop by the mail boxes located outside of the Ms. O'Hara's office and make unspecified comments and gestures to her, which fed her feelings of hopelessness and despair. (Doc. 78 at 18).

Defendant does not deny or address any of these allegations, but asserts generally that the behavior of which Ms. O'Hara complains is insufficiently severe or pervasive to be considered harassment. Based on the record as summarized above, the court finds that Ms. O'Hara has met her burden of coming forth with sufficient evidence to establish that she subjectively believed that she experienced sexual harassment sufficiently severe or pervasive to alter the terms or conditions of her employment. *Cf., Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584-86 (11th Cir. 2000).

The objective component presents a more difficult question. Absent meaningful detail about the frequency and nature of the alleged conduct, it is difficult to conclusively determine whether Cartwright's conduct was objectively sufficiently severe or pervasive to rise to the level of a statutory violation. As will be recalled, the court is to consider the frequency and severity of the conduct, whether it is physically threatening or humiliating and whether it interferes with the employee's job performance. In *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 584-86 (11th Cir. 2000), during a six month period, a supervisor made a single non-sexual comment about the plaintiff's appearance, frequently phoned her at home, although at no point during the calls did the supervisor make any sexual explicit remarks or innuendos, stared at her twice, touched her ring and bracelet, repeatedly asked her to lunch, and one time placed his hand on her knee and one time touched the hem of her dress. The court found the supervisor should not have done the latter two things, but that each incident was only momentary and was not coupled with any verbal suggestions or advances. *Id.* at 585. It reversed a jury's verdict finding the defendant liable for hostile environment sexual harassment, stating that a finding that the plaintiff's complaints rose to the level of sexual harassment would "trivialize true instances of sexual harassment." *Id.* at 586. In *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247 (11th Cir. 1999) the Eleventh Circuit affirmed the district court's grant of summary judgment for the former employer, finding that female employee's allegations that her supervisor followed her at work, "constantly" looked her up and

down, twice stopping at her groin area and sniffing, and brushed his hip against hers while passing her in a small doorway were not severe or pervasive enough to constitute actionable sexual harassment).[14]  The *Mendoza* plaintiff admitted that the

---

[14]The *Mendoza* court offered the following examples of cases where circuit courts had rejected sexual-harassment claims based on conduct that was as serious or more serious than the conduct at issue in that case:  *Shepherd v. Comptroller of Public Accounts of Texas*, 168 F.3d 871, 872-75 (5th Cir.1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim); *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264-67 (5th Cir.1999) (noting it was "dubious" whether several sexually oriented comments and gestures and an implied threat of retaliation for refusing a sexual advance would be sufficient to establish a hostile environment); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2nd Cir.1998) (holding that statement that plaintiff had the "sleekest ass" in office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir.1998) (holding actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc*., 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (holding offensive comments including repeatedly calling the plaintiff a "sick bitch" insufficient under Harris because not necessarily gender-related); *Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir.1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns"; suggesting land area be named as "Titsville" or "Twin Peaks"; asking plaintiff, "Say, weren't you there [at a biker bar] Saturday night dancing on the tables?"; stating, "Just get the broad to sign it"; telling plaintiff she was "paid great money for a woman"; laughing when plaintiff mentioned the name of Dr. Paul Busam, apparently pronounced as "bosom"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); *Kidwai v. McDonald's Corp*., No. 93-1720, 1994 WL 136971 (4th Cir.1994) (holding insufficient under Harris seven incidents, including one instance in which harasser asked plaintiff whether "she was in bed with someone"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims-supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work-were not sufficient for actionable sexual harassment); see also *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 593 (5th  Cir. 1995) ("A hostile environment claim embodies a series of criteria that express extremely insensitive conduct against women, conduct so egregious as to alter the conditions of employment and destroy their equal opportunity in the workplace."); *Indest v. Freeman Decorating, Inc*., 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that

alleged harasser never said anything to her that could be perceived to be of a sexual nature and that the brush by the fax machine was the only physical contact over a period of 11 months. In *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1302 (11th Cir. 2007), the district court had found that a supervisor propositioning an employee at a company banquet and on the drive home, cornering her in his office and propositioning her by saying "Hey, babe, blow me," approaching her on more than one occasion and saying "hey, babe" while playing with his zipper, and approaching her from behind two or three times and saying "hey, babe" and breathing down her neck over a period of 13 months was not sufficiently severe or pervasive enough to alter the terms and conditions of her employment. 480 F.3d at 1302-1303.[15] Cf. *Deel v. Metromedia Restaurant Services Management Co., L.P.*, 2006 WL 897606 (N.D. Fla. 2006) (offensive conduct which occurred on an almost daily basis for two months was frequent enough to withstand a motion for summary judgment). Although the case at bar presents an extremely close question, taking the evidence in the light most favorable to the pro se plaintiff, the court finds that Ms. O'Hara has come forward with sufficient evidence to establish a *prima facie* case of discrimination sufficient to survive summary judgment.[16] The court's inquiry does not end there, however.

---

permeated the plaintiffs' work environment.").

*Mendoza v. Borden, Inc.* 195 F.3d 1238, 1246 -1247 (11th Cir. 1999).

[15]The Eleventh Circuit did not reach the issue of whether this conduct was sufficiently severe or pervasive to alter the terms of plaintiff's employment because it found that she had not suffered a tangible employment action and thus the *Faragher-Ellerth* defense applied. *Burlington Industries Inc.v. Ellerth*, 524 U.S.742, 762-763, 765, 118 S.Ct. 2257, 2269, 2270, 141 L.Ed. 2d 633 (1998); *Faragher* v. City of Boca Raton, 524 U.S. 775, 808, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998). To prevail under this two-part defense, an employer must show that it fulfilled its responsibility to prevent or correct workplace harassment and that the employee fulfilled her responsibility to protect herself and others from harassment by using the appropriate procedures to report it. *Baldwin*, 480 F.3d at 1292, 1303. The defense is not available where the employee suffered a tangible adverse employment action, although it is available to defend against a hostile environment claim without such action. *Baldwin,* 480 F.3d at 1303.

[16]This is not equivalent to saying that the plaintiff will be able to establish a *prima facie* case at trial or to prevail on her claim.

**<u>Defendant's proffered reason for employment decision and Ms. O'Hara's rebuttal</u>**

Once a plaintiff establishes a prima facie case of discrimination, under the *McDonnell Douglas* framework, the burden shifts to the plaintiff's employer to articulate a non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973); *Wilson v. B/E Aerospace, Inc.,* 376 F.3d at 1087. Assuming it is able to offer a non-discriminatory reason, the burden again shifts to Ms. O'Hara to show that the non-discriminatory reason offered by UWF was a pretext for discrimination. *McDonnell Douglas, supra.* "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir. 1996); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987); *Perrero v. Spectacor Management Group,* 308 Fed.Appx. 327 (11th Cir. 2009); *Baker v. Russell Corp.*, 2010 WL 1434404 (11th Cir. 2010).[17] If "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000); (cited with approval in *Baker v. Russell Corp.*, 2010 WL 1434404 (11th Cir. 2010)). This is because federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions... [their]inquiry is limited to whether the employer gave an honest explanation of its behavior." *Chapman*, 229 F. 3d at 1030 (quoting *Elrod v. Sears, Roebuck* & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988))). A plaintiff's self-serving

---

[17]The undersigned cites *Perrero* and *Baker* only as persuasive authority to show that the proposition set forth in *Young* and its progeny remains good law and recognizes that the opinions themselves are not considered binding precedent. *See* 11th Cir. R. 36-2.

assertion that the proffered reason she was terminated is inaccurate and pretextual does not alone establish that she was terminated for an unlawful reason. See *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004).

In this case the defendant has presented evidence that Ms. O'Hara was hostile to co-workers, insubordinate with supervisors, and unable to either communicate effectively or accept advice or feedback, that she was the cause of a strained atmosphere in the SBDC both at UWF and in the regional centers, and that she refused suggestions to obtain counseling through the University's EAP. Mr. Cartwright states he consulted with Ms. O'Hara's immediate supervisor, and they concluded that it was in the best interests of the SBDC not to renew her contract. (Doc. 74, exh. 2). He also avers that he "was not motivated by any unlawful animus in determining that Ms. O'Hara should no longer be employed by the SBDA. (*Id.*) Defendant argues that Ms. O'Hara has offered only her subjective beliefs and her assumptions about Mr. Cartwright's motive and that she has no evidence that the proffered reasons for not renewing her contract were unworthy of belief or were a pretext for discrimination.

Ms. O'Hara maintains that the alleged performance deficiencies identified by the defendant were pretextual. She asserts that her work performance was never a problem, that she was not hostile or insubordinate to superiors, and that she was never negative, loud and argumentative. Ms. O'Hara contends that she was unwilling to be alone in the same room with Mr. Cartwright and that Ms. Hoeschler was aware of this. (Doc. 78 at 13-14). She denies that Hoelscher or Cartwright ever attempted to counsel her, and draws attention to her November, 2004 performance evaluation in which she had a "superior" rating only five months before Cartwright told her that her contract would not be renewed. (Doc. 78, exh. C). For this evaluation, Ms. O'Hara's performance was rated as being "above expectations" or "superior" in 10 of 11 categories. There was only a single area in which she received the middle ranking of "meets expectations:" the category of cooperation. She asserts that this "low" (actually average) ranking was due to her unwillingness

to be a "team player" in the inappropriate sense Cartwright had wanted her to be. There is no evidence of any written attempts at "counseling" or "corrections" due to any perceived performance shortcomings until Cartwright's letter of April 18, 2005.

Ms. O'Hara also notes the timing of the adverse employment action, which is more relevant to her claim of retaliation. She asserts that she was sent home directly after she sent her April 18, 2005 letter to the University's HR department complaining about Mr. Cartwright's treatment in a situation caused by Mr. Cartwright himself as a result of maintaining a hostile workplace. (Doc. 78 at 6). She characterizes Mr. Cartwright's actions as "rash" and "retaliatory," although admitting that her letter to HR contained no reference to sexual harassment. She suggests Cartwright created the "hostile" environment, making it impossible for her to work with the other departments "in order try (sic) once again to get his way with the plaintiff," and that he made arbitrary decisions about the DETA program to remind her that he was the boss and that she "knew what she had to do" to make the DETA program successful. (*Id.* at 7-8). These assertions appear to be pure conjecture without evidentiary foundation.

Ms. O'Hara next draws the court's attention to the fact that her contract expired on September 29, 2005 and questions why, if her position was truly "subject to termination at any time" as stated in Ms. Faria's affidavit, Cartwright did not terminate the contract on April 27, 2005 instead of directing her to work from home through the completion of the contract term and telling her that the contract would not be renewed. She appears to suggest that if poor performance were truly the sole motivation for the "work from home" directive, she would have been terminated immediately. A copy of the contract was not offered into evidence by either party, and the court cannot speculate on its terms.

Finally, Ms. O'Hara offers Mr. Cartwright's failure to deny her allegations as proof of their veracity. However, as stated in the court's order directing her to

respond, defendant is not required to submit evidence negating plaintiff's claim. (Doc. 76 at 1).

Again, the case presents a close question. The defendant has clearly met its burden of producing a legitimate non-discriminatory reason for its actions. However, Ms. O'Hara's challenges to the defendant's reason, in particular the production of a "superior" performance evaluation five months before she was told her contract would not be renewed, and her suggestion that if her performance were as deficient as defendant insinuates, defendant would have terminated her contract immediately rather than allowed it to continue for another five months, and even defendant's failure to address the allegations of harassment, raise a question of fact about whether the defendant's proffered reason was truly the motivating factor for its employment decision.


## Legal Standard for Retaliation Claims

Title VII, 42 U.S.C. § 2000e-3(a), makes it unlawful for an employer to discriminate against an employee because he or she "has opposed any practice made an unlawful employment practice by this subchapter...." Plaintiff may state a claim for retaliation by using either direct or circumstantial evidence. *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998). To establish a prima face case of retaliation using circumstantial evidence, a plaintiff may show that (1) she engaged in a statutorily protected activity; (2) that the employer took an adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007); *Berman*, 160 F.3d at 701; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2410-16, 165 L.Ed.2d 345 (2006); see also *Martin v. Brevard County Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008) (applying same test in context of FMLA retaliation claim).

The Supreme Court has interpreted the second prong as requiring a plaintiff to show that "a reasonable employee would have found the challenged action

materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (quotations and citations omitted) (announcing "materially adverse" element for Title VII claims).  Under *Burlington*, "the type of employer conduct considered actionable has been broadened from that which adversely [a]ffects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment or workplace-related." *Crawford v. Carroll*, 529 F.3d 961, 973 (11th Cir. 2008).

To establish the third prong, a causal connection, "a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (quoting *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)) (quotations and alterations omitted)  To make this showing, a plaintiff must establish that "the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)  Close temporal proximity between the protected conduct and the adverse action is sufficient circumstantial evidence to create a genuine issue of material fact regarding the existence of a causal connection. *Id.*; *McCann* 526 F.3d at 1376. When an employer makes a tentative decision before protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation. See *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (2001) (holding that, where an employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed "along the lines previously contemplated, though not yet definitively determined," did not establish evidence of causality).

The *McDonnell Douglas* burden-shifting analysis applies to retaliation cases involving circumstantial evidence.  The plaintiff must first show that she established

a *prima facie* case of retaliation. The employer then puts forth a legitimate, non-retaliatory reason for its decision. The burden then shifts back to the plaintiff to show by a preponderance of the evidence that the reason given was a pretext for retaliation. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

## Ms. O'Hara's *prima facie* case

Ms. O'Hara asserts that she established the elements of the *prima facie* case because she complained about Strain's and/or Cartwright's behavior, her contract was not renewed and she was directed to work from home before the contract's end, and this adverse employment action was in close temporal proximity to her complaint to HR about Mr. Cartwright.

The defendant attacks the elements of Ms. O'Hara's *prima facie* case. First, it argues that Ms. O'Hara did not engage in statutorily protected activity because her informal complaints were not protected activity under prevailing case law. *Citing Saffold v. Special Counsel, Inc.,* 147 Fed.Appx. 949, 951 (11th Cir. 2005). Under the circumstances set forth in *Saffold,* the *Saffold* plaintiff's complaints did not constitute protected activity. Otherwise it is well established that Title VII protects not just "individuals who have filed formal complaints," but also those "who informally voice complaints to their superiors or who use their employers' internal grievance procedures." See *Shannon v. Bellsouth Telecommunications, Inc.,* 292 F.3d 712, 716 n.2 (11th Cir. 2002) (quoting *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)); *Pipkins v. City of Temple Terrace, Fla.,* 267 F.3d 1197, 1201 (11th Cir. 2001); see also *Gerard v. Board of Regents of State of Ga.,,* 324 Fed.Appx. 818, 825 (11th Cir. 2009) (citing *Pipkins*); *Laosebikan v. Coca-Cola Co.*, 167 Fed.Appx. 758 (11th Cir. 2006) (same). Defendant denies that Ms. O'Hara complained of any unlawful employment practices or filed formal complaints with HR, pointing to the fact that UWF has no record of any such complaints, whether dealing with sexual harassment or otherwise. As the case law above makes clear, formal

complaints are not required. Furthermore, Ms. O'Hara has averred that Larry Strain was made to apologize for certain actions that she found offensive, a fact that certainly lends itself to the conclusion that a complaint of some sort precipitated the apology.

Defendant next contends that Ms. O'Hara has failed to establish that she had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. And absent such belief, even if she did complain, she has not engaged in statutorily protected expression. As discussed above, there is a subjective and an objective component. A plaintiff must show both that she subjectively believed that the employer was engaged in unlawful employment practices and this belief must be objectively reasonable in light of the facts and record presented. *See, e.g., Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311-1312 (11th Cir. 2002). Defendant maintains that regardless of Ms. O'Hara's subjective belief about the nature of defendant's actions, she is unable to satisfy the objectively reasonable component of the test, because her assertion that she complained of an unlawful employment practice "is not externally verifiable." Whether's Ms. O'Hara's alleged complaint about the defendant's employment practices is objectively reasonable does not depend on a third party's ability to physically verify that such a complaint was made, but rather on the objective reasonableness of her belief that she is reporting an unlawful employment practice. The fact that there is no physical evidence of statutorily protected activity which might have formed the basis for the retaliation of which Ms. O'Hara claims to have suffered goes to the credibility of her retaliation claim, not the objective reasonableness of the claim that she allegedly reported.

The court does find the lack of written records about Ms. O'Hara's alleged complaints somewhat discomfiting.[18] There is also no record evidence from the

---

[18]Ms. O'Hara contends that the HR notes dated June 6, 2003 constitute evidence of a complaint about illegal activity. (Doc. 74, exh. 1, exh A). The reference within the notes to "*other issues* between [O'Hara, Strain and Cartwright]" is too oblique for the court to conclude it alludes to unlawful sexual harassment.

defendant about how the physical records of such complaints might be handled or conserved in the ordinary course of business, and the court should not make assumptions about the defendant's business or record keeping practices.  In its response, defendant puts the onus of producing such records on the Ms. O'Hara, stating that it "defies even basic common sense that one believing they (sic) have been repeatedly harassed and penalized for not engaging in sexual conduct would not keep documentation of any complaints made, even after multiple attempts at relief." (Doc. 74 at 13).  The court concurs that it would be a natural and prudent course of action for a complaining individual to keep records.  However, as Ms. O'Hara stated or implied several times at her deposition, she had no experience with this sort of situation and did not expect to end up in litigation, so she did not prepare for that eventuality.  Taking the facts in the light most favorable to the Ms. O'Hara, the court must conclude that she engaged in statutorily protected activity by making complaints about the behavior of Strain, Cartwright, or both.

Defendant next contends that Ms. O'Hara has not established the third prong of a retaliation claim: that there was a causal connection between the alleged statutorily protected activity and the adverse employment action.  As noted above, there is no documentary evidence that would establish the time frame of Ms. O'Hara's complaints to HR.  Defendant states that when questioned, Ms. O'Hara was unable to provide even loose time frames for when she made her complaints.  (Doc. 74 at 14).  Therefore, it argues, Ms. O'Hara's retaliation complaint must fail because she cannot argue causation due to temporal proximity.  See *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).  The *Thomas* court held that a three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.  *Id.* (citing cases).  It further held that "in the absence of other evidence tending to show causation, if there is a substantial

delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.* (citing cases).

Ms. O'Hara states that University policy is to share investigation information with both the complainant and the respondent in a sexual harassment investigation, and therefore this is proof that Mr. Cartwright knew about her complaints. While this may be true, the fact that Ms. O'Hara has not provided any information regarding the dates of her complaints is potentially fatal to her retaliation claim. Regardless of the content of the notes from the June 6, 2003 meeting with HR, an argument that the retaliatory adverse employment action came as a result of this "complaint" would fail as a matter of law. More plausible is Ms. O'Hara's assertion that it was her April 18 letter, a copy of which was sent to HR via email (doc. 78 at 19, 20) that allegedly resulted in her termination, which satisfied the temporal proximity requirement. However, Ms. O'Hara herself concedes that the letter that was sent to HR did not include any complaints regarding "any practice made an unlawful employment practice by this subchapter" such that it could form the basis for a retaliation claim under Title VII. Therefore Ms. O'Hara has failed to establish a *prima facie* case on her retaliation claim, and defendant is entitled to summary judgment.

## CONCLUSION

The summary judgment record establishes that genuine issues of material fact remain with respect to Ms. O'Hara's claim of sexual harassment and that the motion for summary judgment filed by the Board of Trustees of the University of West Florida should be denied.

With respect to her retaliation claim, there are no genuine issues of material fact for trial and The Board of Trustees of the University of West Florida is entitled to judgment as a matter of law.

Accordingly, it is respectfully RECOMMENDED:

1. That defendant Board of Trustees of the University of West Florida's motion for summary judgment (doc. 74) be GRANTED as to plaintiff's claim of retaliation in violation of Title VII and DENIED as to plaintiff's claim of sexual harassment as set forth herein.

2. That the file be referred to the undersigned for further proceedings.


At Pensacola, Florida this 12th day of July, 2010.


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.** A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).